**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMIR CLAYTON POWELL ) | |
| ) | **Civil No. 23-CV-0336-DLF** |
| *Plaintiff,* ) | |
| ) | |
| **v.** ) | **Jury Trial Demand** |
| ) | |
| NATIONAL INSTITUTE OF ) | |
| BUILDING SCIENCES ) | |
| ) | |
| *Defendant.* ) | |
| ) | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

1.     Comes now Plaintiff Amir Clayton Powell (hereinafter "Plaintiff", "Plaintiff Powell" or "Mr. Powell"), by and through his attorneys, and hereby files this Complaint against Defendant National Institute of Building Sciences (hereinafter "NIBS") seeking relief pursuant to the D.C. Human Rights Act, D.C. Code § 2-1401 *et seq*.; and the D.C. Wage Payment Collection Law, D.C. Code § 32-1302 *et seq*. and the D.C. Wage Theft Prevention Act, 61 D.C. Reg. 10157 (Oct. 3, 2017); and Defamation; and Breach of Contract; and Wrongful Termination. Plaintiff seeks relief including but not limited to declaratory, injunctive, and other equitable relief, compensatory and punitive damages and litigation expenses and reasonable attorneys' fees, based on Defendant's discriminatory, harassing, and retaliatory actions against Plaintiff.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this Complaint pursuant to D.C. Code § 11-921.

3.     Plaintiff has exhausted all administrative remedies prior to filing suit.

4.     Venue is proper in this Court in that the events and omissions giving rise to Plaintiff's claims occurred here in the District of Columbia and Defendant may be found here.

**PARTIES**

5.     Plaintiff Amir Clayton Powell is an African American male and an experienced executive professional. At all relevant periods, Mr. Powell was an employee subject to protection under the D.C. Human Rights Act, D.C. Code § 2-1401 *et seq*.; and the D.C. Wage Payment Collection Law, D.C. Code § 32-1302 *et seq*. and the D.C. Wage Theft Prevention Act, 61 D.C. Reg. 10157 (Oct. 3, 2017).

6.     Defendant National Institute of Building Sciences is a non-profit organization that brings together different stakeholders to solve problems which hamper the construction of safe, affordable structures for housing, commerce and industry in the U.S.  At all relevant periods, NIBS was an employer within the meaning of the D.C. Human Rights Act, D.C. Code § 2-1401 *et seq*.; and the D.C. Wage Payment Collection Law, D.C. Code § 32-1302 *et seq*. and the D.C. Wage Theft Prevention Act, 61 D.C. Reg. 10157 (Oct. 3, 2017).

**FACTUAL ALLEGATIONS**

7.     Mr. Powell accepted a position as President and CEO of NIBS on August 7, 2022 and began employment on September 12, 2022.  Mr. Powell is trained as a lawyer and holds a Juris Doctorate (JD) degree, and is a seasoned executive who has been successful at several organizations.  At NIBS, Mr. Powell reported to the Board of Directors and as President and CEO of NIBS, he was a member of the Board of Directors and Executive Committee, according to NBIS' By-Laws.  During his tenure, Anne Ellis, a white female, served as the Chair of the NIBS Board of Directors ("BoD" or "Board"), and Thomas Phoenix, has served as the Vice Chair of the BoD.  Mr. Powell was preceded in his position by Henry Green, an African American male, and

Lakeisha Woods, an African American female, and Steven Ayers, a white male, who did not have a Secret Level Security Clearance. During Mr. Green's tenure, he forbade Board Members, including Anne Ellis, from entering the offices of NBIS staff because Ms. Ellis sought to interfere with CEO carrying out his duties. Ms. Woods departed her position because Ms. Ellis failed to present her with a new contract until the very end of her contract and when it did so, it offered terms that were unacceptable to her.

8.      In 2022, NIBS had multiple contracts with the federal government and as a condition of his employment, Mr. Powell had to obtain a Secret Level security clearance. Mr. Powell was given an offer letter/contract which did not include a requirement that obtain a security clearance, but was informed at the time he was offered the position that he would have to obtain a security clearance. He was not given a date by which he had to obtain a security clearance.  Mr. Powell commenced work at NIBS on September 12, 2022 and there was no requirement that he obtain a clearance before his start date.

9.      Mr. Powell had a Senior Management team, which consisted of himself, Robert Smith, Christian Peterson, Bob Payn, Rebecca Liko and Roark Redwood.  Shortly after he began employment, he observed a troubling pattern of Ms. Ellis interfering with the day-to-day operations of NIBS by attempting to micromanage Mr. Powell and cajoled Mr. Powell's direct reports to provide her with information about Mr. Powell that she continually tried to use against him. Mr. Powell was responsible for all personnel decisions, including hiring and termination, but Ms. Ellis frequently complained about individuals Mr. Powell hired and that they were not approved by the Board. Ms. Ellis was upset that Mr. Powell made a decision to remove Jennifer Hintzke from her position as the CEO assistant and place her in a meeting and planning position because Ms. Hintzke would report to Ms. Ellis all actions taken by Mr. Powell. Ms.  Hintzke was

later recruited by Ms. Eillis to undertake a study to undermine Mr. Powell on where NBIS resources should be deployed and presented the study to the Board at Ms. Ellis' request. Additionally, Ms. Ellis sent frequent demands to Mr. Powell for a meeting on a certain date and if he was not free due to a conflict, Ms. Ellis would go directly to his staff at NBIS. Ms. Ellis demanded that Mr. Powell justify all travel for himself, and demanded that NBIS pay for travel for Board members to meetings.

10.     Mr. Powell applied for an interim security clearance in December 2022, and was issued an interim security clearance in January 2023. On February 3, 2023, Mr. Powell met with a Department of Defense ("DoD") special agent, who was investigating Mr. Powell's background in furtherance of his application for a Secret Level security clearance. Bob Payn, the NIBS Facility Security Officer ("FSO"), informed Mr. Powell that Mr. Powell had been issued an interim security clearance. Mr. Payn explained that interim clearances were only issued when the initial investigation did not reveal any evidence that the subject would otherwise not be eligible for access to classified information and further suggested that Mr. Powell's full clearance should be granted sometime in the ensuing three months or earlier. Mr. Payn did not ask Mr. Powell to execute a Standard Form--SF 312; nor did he brief Mr. Powell on other requirements for access to classified materials—both of which are required by the procedures prescribed by the National Industrial Security Program, codified in 32 CFR § 117. In March 2023, DCSA completed its investigation of Mr. Powell, and Mr. Payn received a letter from the Defense Counterintelligence and Security Agency ("DCSA") inquiring if NIBS still needed a Secret Level Security Clearance for Mr. Powell. Mr. Payn did not respond to the letter. By statute, DCSA was permitted to extend an interim clearance for 180 days.

11.     In April 2023, Ms. Ellis informed Mr. Powell that she and Mr. Phoenix, and another Board member, Sandra Benson, would be the committee to manage the CEO 360 Review. Mr. Powell selected the Human Resources ("HR") consultant, Ashley Kelloff, who would conduct the review. Ms. Kelloff interacted directly with the CEO 360 Review committee—composed of Ms. Ellis, Mr. Phoenix, and Ms. Benson—and all stakeholders were interviewed through the CEO 360 Review process. Ms. Kelloff and Mr. Powell met twice during this process: (a) once to discuss the process and timeline; and (b) once to conduct Mr. Powell's self-assessment. During the meeting to conduct Mr. Powell's self-assessment, Ms. Kelloff expressed concern that Ms. Ellis and Mr. Phoenix were seeking to use this process for purposes for which it was not intended. Ms. Kelloff further expressed her confidence that the process itself could not be perverted for nefarious ends.

12.     On May 23, 2023, NIBS held the May 2023 meeting of the NIBS Board of Directors at its headquarters in Washington, D.C. Most of the nineteen volunteer seated members of the BoD attended in person. At the opening of the meeting, Ms. Ellis asked one of Mr. Powell's colleagues, Jennifer Hintzke, who serves as the Director of Governance and Special Programs, to share a webpage detailing the twenty largest government contractors (by gross revenue) in the Greater Washington area. This information had been researched and prepared by Ms. Hitzke without Mr. Powell's knowledge, apparently at Ms. Ellis' direction. Ms. Ellis then stated, in what was a prepared script, that NIBS would be one of the twenty largest government contractors in Greater Washington by revenue.  Based upon this information, Ms. Ellis announced that, "We are a corporate board, and we need to behave like a corporate board" and admonished the BoD to act more like the Board of a for-profit corporation. Throughout this meeting, Ms. Ellis called for several executive sessions. To Mr. Powell's alarm as the President and CEO, he was asked to leave the boardroom to allow for private deliberations among the volunteer members of the NIBS BoD.

Mr. Powell was the only member of the Executive Team excused from the meeting. One of these executive sessions included Board Member Russ Manning asking the auditor how NIBS could diversify its annual revenue. The auditor responded that this would be "a discussion that would need to be had with AC [Mr. Powell] and Rebecca," referring to Rebecca Liko, who served as Chief Financial Officer ("CFO") and now as both CFO and Acting CEO. During another executive session, Ms. Ellis stressed the need to remind Mr. Powell that he works for the NIBS BoD. Ms. Ellis also encouraged other Board Members to remember that Mr. Powell works for them.

13.     On May 30, 2023, Mr. Payn, the NIBS FSO, demanded that Mr. Powell reveal strategic operations information to him so that Mr. Payn could vet the same with the Department of Defense to ensure that NIBS was not violating any of the DoD's rules or operating procedures.

14.     Mr. Powell met with Ms. Ellis, Mr. Phoenix and Ms. Kelloff, on June 12, 2023 for dinner at Ms. Ellis' request. During this meeting, Ms. Kelloff presented the results of the CEO 360 Review. At the beginning of the meeting, Ms. Kelloff stated that the CEO 360 Review was based on Mr. Powell's key performance indicators ("KPIs"), negotiated between him and Mr. Phoenix together with former NIBS Treasurer, Darrell Rounds. Ms. Kelloff went on to state that the people interviewed considered Mr. Powell to be a "visionary" and a "good leader."

15.     Ms. Kelloff also commented that Mr. Powell's employees really enjoyed working for him. Ms. Kelloff went on to state that she wanted to offer some "areas for improvement," compiled from the responses in the interviews she conducted. The "5 Focus Areas for Improvement" presented by Ms. Kelloff included: (1) Alignment of the CEO role to that of the Board's Role at NIBS; (2) Socialization of the Implementation Plan; (3) Prioritization / Balance; (4) Optics; and (5) Communications. Under the "Alignment of CEO role" focus area, Ms. Kelloff noted that some of those interviewed opined that Mr. Powell needed to be "clear on the reporting

relationship to the Board." Under the "Communications" focus area, Ms. Kelloff noted that "'my people' comments and opinions on things outside of the NIBS strategy appear too biased and controversial and go against the inclusivity NIBS has been cultivating." When Mr. Powell asked for the source of these comments, Ms. Kelloff deferred to Ms. Ellis, and Ms. Ellis only stated that it arose in interviews with staff. Mr. Powell recounted that he referred to the NIBS staff as "my people" while describing what he expected from staff members who wanted to rise to leadership positions. Mr. Phoenix promptly agreed with Mr. Powell's assessment, stating, "That is exactly right." Mr. Phoenix then turned to Mr. Powell's use of "hotep" as a greeting in his emails. Mr. Phoenix stated that he had been told and confirmed through his own research that a terrorist group was now using "hotep" as a greeting and that Mr. Powell should discontinue using the term in his greetings because it reflected poorly on NIBS. By way of background, "Hotep!" is a friendly greeting in certain circles of Afro-centric and Black culture and is devoid of political implication let alone violent extremism. It is the equivalent of a Jewish person saying "Shalom" or a Muslims saying "Salam." Mr. Phoenix's comments were very hurtful and attacked Plaintiff's ethnic identity. When Plaintiff said he would look into the matter, Mr. Phoenix responded "You can do what you want.  No one is telling you how to communicate, but it would probably be better to stop using that word just to avoid any confusion." At that point, Ms. Kelloff chimed in and offered, "If it is going to cause any confusion at all, why not just stop using it?" Ms. Kelloff's comments were as off base as telling a Muslim woman she shouldn't wear a hijab so she doesn't get confused with being a terrorist. As it turns out, while there is a Black nationalist group that calls itself Hotep, it is non-violent and has never been labeled a terrorist organization. Ms. Ellis also fabricated an interaction she had with Mr. Powell's executive assistant to disparage him. She falsely claimed that she called his office to speak to him as was told he was out of town, and she would have to

7

get in line like everybody else to speak to him. In fact, Mr. Powell's executive assistant told Ms. Ellis that Mr. Powell was out of town in San Francisco and that she would attempt to reach him, but she was not certain that she would be able to reach him.

16. At the conclusion of Ms. Kelloff's presentation, Mr. Powell was asked to share his thoughts on the results of the CEO 360 Review and was provided with a copy of Ms. Kelloff's PowerPoint slide deck. The first observation Mr. Powell shared was that the slide deck did not include any positive comments. Ms. Kelloff reiterated that Mr. Powell was held in high regard by staff, clients, and strategic partners. In his second observation, Mr. Powell stated that no one understood the role of the CEO and the position's relationship to the Board of Directors in the context of a not-for-profit corporation better than himself, having taught business law for several years. Mr. Powell reiterated that, given his legal background and other professional experience, it is ridiculous to continue to suggest that he does not understand that, as the NIBS President and CEO, he is responsible to the NIBS BoD. Before leaving the restaurant, Ms. Ellis asked that Mr. Powell not discuss this conversation or the contents of the slide deck provided by Ms. Kelloff with anyone, including any of the other members of the BoD, as this material related to private aspects of his personnel file.

17. On June 13, 2023, Mr. Powell wrote an email to Ms. Kelloff requesting clarification regarding the written portion of the CEO 360 Review. Ms. Kelloff responded on June 22, 2023.

18. On Thursday, July 20, 2023, five weeks after NIBS leadership insinuated Plaintiff's appearance of fealty to a non-existent Black terrorist group, Mr. Powell's interim clearance was withdrawn by the Defense Counterintelligence and Security Agency ("DCSA") because Bob Payn did not respond to DCSA's inquiry in March 2023. DCSA did not take any action on the interim clearance because Mr. Payn did not take any action or pursue it, actions which were beyond Mr.

Powell's control. Although the interim clearance was withdrawn, the Secret Level Security Clearance was not denied. DCSA simply said it could not make a final decision at that time. Ms. Ellis commented to Mr. Payn that Mr. Powell could have been walled off from information that required a security clearance. The DCSA sent a password-protected "Eyes Only Package" notice to Mr. Payn, as the NIBS FSO, to forward to Mr. Powell. The Eyes-Only Package sent from the DCSA stated that it could not make a determination and had further referred Mr. Powell's application to the DCSA Consolidated Adjudication Services ("CAS") for further consideration and final determination. The Eyes-Only Package included a Statement of Reasons ("SOR") with further instructions for Mr. Powell.

19.     On Friday, July 21, 2023, Mr. Payn contacted Ms. Ellis and Mr. Phoenix, as well as members of the NIBS senior management team to alert and inform them of Mr. Powell's interim security clearance. Even though Mr. Powell was on vacation at the time, this Eyes-Only Package was transmitted; Mr. Powell did, however, immediately verify his identity to the DCSA so that he could receive the password to unlock the Eyes-Only Package. Mr. Powell did not receive the password to access the Eyes-Only Package until Monday, July 24, 2023.

20.     On Wednesday, July 26, 2023, upon Mr. Powell's return from vacation, he met with the executive committee ("ExCom") of the NIBS BoD at 3:00 p.m. Mr. Powell was given an opportunity to discuss the status of the interim clearance and answer their questions. At the beginning of this meeting, NIBS legal counsel, Hugh Webster of Webster Chamberlain & Bean (a Washington, D.C. law firm) set forth "ground rules," which included a prohibition on recording the meeting or discussing the deliberations outside of the meeting. In fact, this meeting was described as an executive session. During the meeting, Ms. Ellis asked if Mr. Powell would share the Eyes-Only Package from the DCSA with the ExCom. Mr. Powell declined to share this

material, citing privacy concerns, but offered to share the material included in the Eyes-Only Package with Mr. Webster, provided that Mr. Webster would not share any of the details within the package, but that Mr. Webster would then be able to provide assurances to the BoD that Mr. Powell was telling the ExCom the truth about the status of his interim clearance.

21.     On Thursday, July 27, 2023, at 6:01 p.m., Ms. Ellis requested via email that Mr. Powell make himself available the following day at 4:00 p.m. Eastern time.

22.     On Friday, July 28, 2023, at 11:39 a.m., legal counsel, Mr. Webster of Webster Chamberlain & Bean, contacted Mr. Powell via email to request access to the Eyes-Only Package from the DCSA and assured Mr. Powell that Mr. Webster would not share its contents with anyone. Mr. Powell forwarded the Eyes-Only Package to Mr. Webster at 3:50 p.m. on Friday, July 28, 2023. Ms. Ellis met with the Senior Management Team on July 28, 2023, including Christian Peterson, Robert Smith, Bob Payn, Roark Redwook, and Rebecca Liko, and during this meeting Ms. Ellis made a statement which defamed Mr. Powell. Ms. Ellis stated that Mr. Powell knew he needed a Secret Level Security Clearance when he was hired, he did not get it, and he took a job which he knew he was unqualified for and should be suspended and terminated. In fact, Mr. Powell was never denied a Secret Level Security Clearance, and only the interim clearance was withdrawn because Mr. Payn did not respond to the DCSA inquiry.

23.     At the meeting attended by Mr. Phoenix (who five weeks prior raised the prospects of Plaintiff's appearance of fealty to a non-existent Black terrorist group), Ms. Ellis, Mr. Webster, and Mr. Powell, Ms. Ellis read a prepared statement that the NIBS BoD had voted to place Mr. Powell on paid administrative leave for thirty days out of an "abundance of caution" in light of the issue surrounding Mr. Powell's security clearance. In response to Mr. Powell's question regarding how the period for the administrative leave had been determined, Ms. Ellis stated the timeframe

was based on his suggestion during his meeting with the ExCom on July 26, 2023 that the issue could be resolved in that span of time. Mr. Powell's comment regarding the timeframe in which the issue could be resolved was that the timeframe was, at best, uncertain, i.e., it could be thirty days or it could be another several months. During this meeting, at 4:12 p.m., Mr. Webster forwarded a letter to Mr. Powell, signed by Ms. Ellis, via email that Mr. Powell was being placed on paid administrative leave. During this meeting, Mr. Phoenix stated that the BoD did not have any choice except to place Mr. Powell on administrative leave due to concerns over the suspension of the organization's facility clearance level ("FCL"). Mr. Powell noted that the FCL only covers one contract, which amounts to less than thirty percent of the organization's gross annual revenue. Ms. Ellis stated that she personally spoke with the NIBS DCSA representative, who told her that this action must be taken. When Mr. Powell asked for the name of this DCSA representative, Ms. Ellis replied, "You should know who that is." When Mr. Powell replied that this was the point, implying that such information has been routinely withheld from him, Ms. Ellis replied, "You did not ask?" When Mr. Powell replied, "Well, I am asking, now," Ms. Ellis gave him the name of a DCSA representative whose first name is Eric.

24.     On Saturday, July 29, 2023, a friend of Mr. Powell, who holds an active Top Secret Level clearance ("TSC"), connected him with a DCSA employee who advised Mr. Powell as to the process surrounding the issuance and withdrawal of interim clearances. According to the DCSA employee, it seemed as though Mr. Payn, the NIBS FSO, is untrained and unfamiliar with the proper procedures for processing security clearances.

25.     On Monday, July 31, 2023, Ms. Ellis and Mr. Phoenix convened an All Staff meeting with the entire NIBS professional staff and disclosed that Mr. Powell was being placed on administrative leave and discussed the reason and terms of Mr. Powell's administrative leave.

Again, Ms. Ellis made statements which defamed Mr. Powell. She repeated that Mr. Powell knew he needed a Secret Level Security Clearance when he was hired, he did not get it, and he took a job which he knew he was unqualified for and was placed on administrative leave. In fact, Mr. Powell was never denied a Secret Level Security Clearance, and only the interim clearance was withdrawn because Mr. Payn did not respond to the DCSA inquiry. During Ms. Ellis presentation, a staff member asked Ms. Ellis if she was worried about Mr. Powell's privacy, because her announcement would cause staff to spread rumor over the weekend about Ms. Powell. Ms. Ellis responded that rumors are the best what to get information out. She thereafter threatened staff that she would be terminated if they had any contact with Mr. Powell.

26.     Mr. Powell submitted answers to the Statement of Reasons regarding his eligibility for security clearance and was awaiting a final determination from DCSA CAS. Mr. Powell was advised on August 11, 2023 by Ms. Ellis that he must attend a meeting with her on the morning of Monday, August 14, 2023. Ms. Ellis requested the termination of Mr. Powell and she knew that by terminating his employment, the DCSA security clearance investigation would cease.

27.     On Monday, August 14, 2023, Mr. Powell was terminated via unanimous vote by the NIBS BoD on Thursday, August 10, 2023. The termination of Mr. Powell caused DCSA to terminate its security clearance investigation. He was due his regular pay on August 15, 2023. NIBS failed to pay him his last paycheck on time. Mr. Powell's employment agreement included a term of two years and required three months of severance pay if his employment was terminated in less than two years.

**COUNT I**
**Violation of the District of Columbia Human Rights Act, D.C. Code § 2-1401 *et seq*.**
**Discrimination based on Race**
**Disparate Treatment and Hostile Work Environment**

28.     Plaintiff adopts by reference each of the allegations in the paragraphs above as if set forth fully herein.

29.     At all pertinent times, Defendant National Institute of Building Sciences was an employer under the definition of and subject to provisions of the D.C. Human Rights Act, D.C. Code § 2-1401 *et seq*.

30.     At all pertinent times, Plaintiff Amir Clayton Powell was an employee under the definition of and entitled to protection under the D.C. Human Rights Act, D.C. Code § 2-1401 *et seq*.

31.     The D.C. Human Rights Act prohibits an employer from taking adverse action against an employee or subjecting an employee to a hostile work environment based on the employee's race.

32.     Defendant, in violation of the D.C. Human Rights Act, knowingly and intentionally subjected Plaintiff to discrimination, a hostile work environment and disparate treatment based on his race.  Plaintiff Powell was qualified for his position and his interim security clearance was withdrawn because NIBS failed to respond to an inquiry by DCSA, and then NIBS terminated his employment before he received a final decision on his Secret Level Security Clearance which caused DCSA to cease processing his security clearance. Defendant NIBS discriminated against Plaintiff Powell when NIBS leadership accused Plaintiff of giving an appearance of fealty to a non-existent Black terrorist group on the basis of his using a friendly afrocentric greeting and the Chair of the NIBS Board prevented him from performing his job and subjected him to excessive scrutiny and micromanagement; excluded him to meetings of the Board of Directors and Executive

13

Committee; removed him from his position and placed him on administrative leave pending a security clearance investigation; and terminated his employment on August 14, 2023. Mr. Powell was terminated because he declined to share the Eyes-Only Package because it contained confidential personally identifiable information, the disclosure of which is protected by the Privacy Act and District of Columbia law. Defendant took these actions against Plaintiff based on his race. Plaintiff Powell was treated differently than his white male predecessor who did not have a Secret Level Security Clearance and was not terminated; the reason given for his termination were false since only his interim clearance was withdrawn and his final clearance was not denied. Ms. Ellis subjected Mr. Powell to extreme scrutiny and micromanagement. NIBS failed to follow its own policies and allowing the security clearance process to complete before terminating the employee, and denying Plaintiff Powell attendance at Board of Directors and Executive Committee meetings. Finally, NIBS' justification for suspending and terminating Plaintiff Powell has shifted. Ms. Ellis stated that Mr. Powell could have been walled off from work that required a security clearance.

33.     There was no legitimate business reason for any such acts. Plaintiff was terminated while the review to determine his security clearance eligibility was ongoing, and Plaintiff was able to perform his job without the security clearance.

34.     On information and belief, in addition to the practices enumerated above, Defendant may have engaged in other discriminatory practices that are not yet fully known.

35.     As a direct and proximate cause of the Defendant's actions, Plaintiff lost his position as President and CEO of NIBS.

**Violation of the D.C. Wage Payment and Wage Collection Law, D.C. Code § 1301 *et seq*.
and the D.C. Wage Theft Prevention Act, 61 D.C. Reg. 10157**

36.     Plaintiff adopts by reference each of the allegations in the paragraphs above as if set forth fully herein.

37.     At all pertinent times, Defendant NIBS was an employer under the definition of and subject to provisions of the D.C. Wage Payment and Wage Collection Law, D.C. Code § 1301 *et seq*. and the D.C. Wage Theft Prevention Act, 61 D.C. Reg. 10157.

38.     At all pertinent times, Plaintiff Powell was an employee under the definition of and entitled to protection under the D.C. Wage Payment and Wage Collection Law, D.C. Code § 1301 *et seq*. and the D.C. Wage Theft Prevention Act, 61 D.C. Reg. 10157.

39.      The D.C. Wage Payment and Wage Collection Law requires payment of wages at least once per calendar month, D.C. Code § 32-1302. "Wages" means all monetary compensation after lawful deductions, owed by an employer, whether the amount owed is determined on a time, task, piece, commission, or other basis of calculation. Promised remuneration, includes fringe benefits paid in cash, and accrued leave constitute wages pursuant to D.C. Code § 32-1301(3). The statutes expressly states that when an employer fails to meet payment deadlines, the employer is liable "as liquidated damages 10 per centum of the unpaid wages for each working day which such failure shall continue after the day upon which payment is hereunder required, or an amount equal to treble the unpaid wages, whichever is smaller. D.C. Code. § 32-1304(4).

40.     Defendant violated the D.C. Wage Payment and Wage Collection Law and the D.C. Wage Theft Prevention Act when Defendant terminated Plaintiff's employment and failed to issue him all wages due within one day of his termination.

41.     Defendant had no legitimate business reason for any such acts.

42.     On information and belief, in addition to the practices enumerated above, Defendant may have engaged in other illegal practices that are not yet fully known.

43.     As a direct and proximate cause of the Defendant's actions, Plaintiff suffered damages, including wage loss.

## COUNT III
### Defamation

44.     Plaintiff adopts by reference each of the allegations in the paragraphs above as if set forth fully herein.

45.     Courts in the District of Columbia have held that a claim of defamation requires the plaintiff to prove four elements: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm. *Jankovic v. International Crisis Group*, 429 F.Supp.2d 165, 173-4 (D.D.C. 2006).

46.     A defamatory statement is one that may cause injury to one's profession or damage one's standing in the community. *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005).

47.     Defendant summarily removed the Plaintiff from employment in a manner that defamed him, including removal from his position and placement on administrative leave; disclosure of the details of his placement on administrative leave to staff; Ms. Ellis published on July 28 and 31, 2023 to the Senior Leadership team and all staff false information about Mr. Powell failing to obtain a Secret Level security clearance in a malicious and excessive manner and then suspended and terminated him to damage his personal and professional reputation; and summary termination of his employment before the DCSA CAS reached a final determination on Mr.

Powell's eligibility for security clearance.

48.    The definition of "publication" is any communication to someone other than the person defamed. Restatement (Second) of Torts § 577(1).

49.    On July 28, 2023 and July 31, 2023, Ms. Ellis made statements which defamed Mr. Powell. She stated to the Senior Management Team and all staff that Mr. Powell knew he needed a Secret Level Security Clearance when he was hired, he did not get it, and he took a job which he knew he was unqualified for and was placed on administrative leave. In fact, Mr. Powell was never denied a Secret Level Security Clearance, and only the interim clearance was withdrawn because Mr. Payn did not respond to the DCSA inquiry. During Ms. Ellis' presentation, a staff member asked Ms. Ellis if she was worried about Mr. Powell's privacy, because her announcement would cause staff to spread rumors over the weekend about Mr. Powell. Ms. Ellis responded that rumors are the best what to get information out. She thereafter threatened staff that she would be terminated if they had any contact with Mr. Powell. In terminating Plaintiff's employment by locking him out of his office and removing him from his position in a humiliating manner, and threatening staff if they communicated with him, Defendant defamed Plaintiff and communicated to staff that he engaged in odious behavior that warranted his immediate removal from his position as CEO and termination shortly thereafter. *See Wallace v. Skadden Arps*, 715 A.2d 873 (D.C. 1998) (Plaintiff stated a claim for defamation when the D.C. Court of Appeals noted that "The plaintiff also claims that she was terminated on or about September 20, 1995, effective immediately, that she was effectively locked out of the firm's offices by the inactivation of her access key, and that by terminating her employment in this manner, the defendants maliciously published a false and defamatory communication to the effect that Dr. Wallace had performed some unspecified disgraceful, immoral and/or dishonest act, Skadden, Arps having previously

terminated attorneys in a similar manner only when such attorneys had been caught stealing, engaging in insider trading, or engaging in child molestation."). Ms. Ellis published on July 28 and 31, 2023 to the Senior Leadership team and all staff false information about Mr. Powell failing to obtain a Secret Level security clearance in a malicious and excessive manner and then suspended and terminated him to damage his personal and professional reputation.

50.     Defendant had no legitimate business reason for any such acts since the security clearance review process was ongoing, and the security clearance was not needed for Plaintiff to perform his job. Moreover, otherwise causing DCSA CAS to end its review of Mr. Powell's eligibility for security clearance eliminates any possibility of vindication for Mr. Powell regarding the reasons published for his separation.

51.     On information and belief, in addition to the practices enumerated above, Defendant may have engaged in other illegal practices that are not yet fully known.

52.     As a direct and proximate cause of the Defendant's actions, Plaintiff lost his position as President and CEO of NIBS, and suffered damage to his professional reputation.

<u>**COUNT IV**</u>
**Breach of Contract**

53.     Plaintiff adopts by reference each of the allegations in the paragraphs above as if set forth fully herein.

54.     Plaintiff entered into an employment contract with National Institute of Building Sciences in August 2022 for a period of two years. All contracts in the District of Columbia contain an implied duty of good faith and fair dealing, which requires that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

55. Defendant breached its commitments to Plaintiff in taking deliberate actions to thwart performance under the contract, including prevention of performing the major duties of his position, exclusion from Board of Director meetings, summary placement on administrative leave and termination from his position pending a security clearance review process. Plaintiff's interim clearance was withdrawn and he was terminated while seeking a final decision on his Secret Level Security Clearance which caused his application for a Secret Level Clearance to terminate. Mr. Powell's contract was terminated because he declined to share the Eyes-Only Package because it contained confidential personally identifiable information, the disclosure of which is protected by the Privacy Act and District of Columbia law. He was terminated because he declined to provide this personal information to Ms. Ellis.

56. The collective acts in breach of contract have harmed Plaintiff by denying him the benefits of the contract and resulted in his termination of employment.

## COUNT V
**Wrongful Termination**

57. Plaintiff adopts by reference each of the allegations in the paragraphs above as if set forth fully herein.

58. At all pertinent times, Defendant National Institute of Building Sciences was an employer subject to District of Columbia common law.

59. At all pertinent times, Plaintiff Amir Clayton Powell was an employee to protection under District of Columbia common law.

60. District of Columbia law prohibits the discharge of an employee in a manner which violates public policy. An employer is liable for wrongful discharge when the sole reason for the discharge is the employee's efforts to comply with the law.

61.     Defendant National Institute of Building Sciences wrongfully terminated Mr. Powell when it demanded that he disclose the information in a private Eyes-Only Package from DCSA for Mr. Powell and Mr. Powell declined to share the Eyes-Only Package because it contained confidential personally identifiable information, the disclosure of which is protected by the Privacy Act and District of Columbia law. He was terminated because he declined to provide this personal information to Ms. Ellis. Mr. Powell was also terminated because it became necessary for him to provide additional information in a security clearance review process. As a result, Mr. Powell was subjected to wrongful termination in violation of District of Columbia law.

62.     Defendant had no legitimate business reason for any such acts.

63.     On information and belief, in addition to the practices enumerated above, Defendant may have engaged in other illegal practices that are not yet fully known.

64.     As a direct and proximate cause of the Defendant's actions, Plaintiff lost his position as President and CEO of NIBS, and compensation due to him.

## COUNT VI
### Invasion of Privacy/False Light

65.     Plaintiff adopts by reference each of the allegations in the paragraphs above as if set forth fully herein.

66.     To state a cause of action for "false light" invasion of privacy, a party must allege the publication of a false statement, representation or implication concerning the plaintiff which places the plaintiff in a false light that would be offensive to a reasonable person.

67.     Defendant summarily removed the Plaintiff from employment in a manner that invaded Plaintiff's privacy and cast him in a false light, including removal from his position and placement on administrative leave; disclosure of the details of his placement on administrative leave to staff; Ms. Ellis published on July 28 and 31, 2023 to the Senior Leadership team and all

staff false information about Mr. Powell failing to obtain a Secret Level security clearance in a malicious and excessive manner and then suspended and terminated him to damage his personal and professional reputation; and summary termination of his employment before the DCSA CAS reached a final determination on Mr. Powell's eligibility for security clearance. On July 28, 2023 and July 31, 2023, Ms. Ellis made statements which invaded Plaintiff's privacy and cast him in a false light. She stated to the Senior Management Team and all staff that Mr. Powell knew he needed a Secret Level Security Clearance when he was hired, he did not get it, and he took a job which he knew he was unqualified for and was placed on administrative leave. In fact, Mr. Powell was never denied a Secret Level Security Clearance, and only the interim clearance was withdrawn because Mr. Payn did not respond to the DCSA inquiry. During Ms. Ellis' presentation, a staff member asked Ms. Ellis if she was worried about Mr. Powell's privacy, because her announcement would cause staff to spread rumors over the weekend about Mr. Powell. Ms. Ellis responded that rumors are the best what to get information out. She thereafter threatened staff that she would be terminated if they had any contact with Mr. Powell. In terminating Plaintiff's employment by locking him out of his office and removing him from his position in a humiliating manner, and threatening staff if they communicated with him, Defendant invaded Plaintiff's privacy and cast him in a false light and communicated to staff that he engaged in odious behavior that warranted his immediate removal from his position as CEO and termination shortly thereafter. *See Wallace v. Skadden Arps*, 715 A.2d 873 (D.C. 1998) (Plaintiff stated a claim for defamation when the D.C. Court of Appeals noted that "The plaintiff also claims that she was terminated on or about September 20, 1995, effective immediately, that she was effectively locked out of the firm's offices by the inactivation of her access key, and that by terminating her employment in this manner, the defendants maliciously published a false and defamatory communication to the effect that Dr.

Wallace had performed some unspecified disgraceful, immoral and/or dishonest act, Skadden, Arps having previously terminated attorneys in a similar manner only when such attorneys had been caught stealing, engaging in insider trading, or engaging in child molestation."). Ms. Ellis published on July 28 and 31, 2023 to the Senior Leadership team and all staff false information about Mr. Powell failing to obtain a Secret Level security clearance in a malicious and excessive manner and then suspended and terminated him to damage his personal and professional reputation. A plaintiff is entitled to punitive damages when there is "actual malice" in publication.

68.     Defendant had no legitimate business reason for any such acts since the security clearance review process was ongoing, and the security clearance was not needed for Plaintiff to perform his job. Moreover, otherwise causing DCSA CAS to end its review of Mr. Powell's eligibility for security clearance eliminates any possibility of vindication for Mr. Powell regarding the reasons published for his separation.

69.     On information and belief, in addition to the practices enumerated above, Defendant may have engaged in other illegal practices that are not yet fully known.

70.     As a direct and proximate cause of the Defendant's actions, Plaintiff lost his position as President and CEO of NIBS, and suffered damage to his professional reputation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays as follows:

A.     That the Court issue an Order declaring Defendant's actions to be a violation of the D.C. Human Rights Act, D.C. Code § 2-1401 *et seq*.; and D.C. Wage Payment and Wage Collection Law, D.C. Code § 1301 *et seq.* and D.C. Wage Theft Prevention Act, 61 D.C. Reg. 10157; and Defamation; and Breach of Contract; and Wrongful Termination, and declaring Plaintiff eligible to receive equitable and other relief;

B.      That the Court issue a permanent injunction prohibiting Defendant from engaging in any discriminatory terminations and wage theft;

C.      That the Court enter judgment in favor of Plaintiff against Defendant for all equitable monetary damages available under the law, including but not limited to back pay and front pay in amounts to be determined at trial and all bonuses to which Plaintiff is entitled;

D.      That the Court order Defendant to refrain from any retaliation against Plaintiff or any other person, for participating in or supporting this case in any manner;

E.      That the Court order Defendant, individually and collectively, to pay compensatory and punitive damages in an amount no less than ten million dollars ($10,000,000);

F.      That the Court order Defendant to pay Plaintiff's reasonable attorneys' fees, expert fees and costs;

G.      That the Court order Defendant to pay pre-judgment and post-judgment interest as provided by law; and

H.      Any and all relief that this Court deems just.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all claims against Defendant.

Date: January 3, 2024                                Respectfully submitted,

                                         _____*/s/ David A. Branch*_____
                                         David A. Branch [D.C. Bar No. 438764]
                                         Law Office of David A. Branch
                                         & Associates, PLLC
                                         1828 L Street N.W., Suite 820
                                         Washington, D.C. 20036
                                         (202) 785-2805 phone
                                         (202) 785-0289 fax
                                         davidbranch@dbranchlaw.com